**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ROGER PAUL SMITH,
*Petitioner-Appellant,*

v.

GEORGE H. BALDWIN,
*Respondent-Appellee.*

No. 04-35253

D.C. No.
CV-98-00059-OMP

OPINION

Appeal from the United States District Court
for the District of Oregon
Owen M. Panner, Senior Judge, Presiding

Argued and Submitted
June 18, 2007—San Francisco, California

Filed December 26, 2007

Before: Alex Kozinski, Chief Judge, and
Mary M. Schroeder, Stephen Reinhardt, Andrew J. Kleinfeld,
Sidney R. Thomas, M. Margaret McKeown,
Kim McLane Wardlaw, William A. Fletcher,
Raymond C. Fisher, Richard A. Paez, Richard C. Tallman,
Richard R. Clifton, Jay S. Bybee, Milan D. Smith, Jr. and
Sandra S. Ikuta, Circuit Judges.

Milan D. Smith, Jr., Circuit Judge, delivered the opinion of
the court, in which Kozinski, Chief Judge, and Kleinfeld,
McKeown, Wardlaw, Tallman, Clifton, Bybee and Ikuta,
Circuit Judges, join.

Raymond C. Fisher, Circuit Judge, filed a concurring
opinion, in which Schroeder, W. Fletcher, and Paez,
Circuit Judges, join.

16637

Stephen Reinhardt, Circuit Judge, filed a dissent, in which Thomas, Circuit Judge, joins.

Sidney R. Thomas, Circuit Judge, filed a separate dissent.

**COUNSEL**

Thomas J. Hester, Office of the Federal Public Defender, Portland, Oregon, for the petitioner-appellant.

Kathleen Cegla, Assistant Attorney General; Erin C. Lagesen, Assistant Attorney General (argued), Salem, Oregon, for the respondent-appellee.

**OPINION**

MILAN D. SMITH, JR., Circuit Judge:

We took this case en banc to correct a misconstruction of the *Schlup v. Delo*, 513 U.S. 298 (1995), "actual innocence" "gateway" by a divided panel of this court in *Smith v. Baldwin*, 466 F.3d 805 (9th Cir. 2006), *reh'g en banc granted*, 482 F.3d 1156 (9th Cir. 2007). The panel erroneously held that Petitioner-Appellant Roger Paul Smith could satisfy the "actual innocence" standard to overcome "a procedural

default of his claims insofar as they relate to his felony murder conviction," thus permitting him to proceed with his constitutional claims. *Smith*, 466 F.3d at 807. We disagree, and we affirm the decision of the district court.

While burglarizing the home of Emmett and Elma Konzelman, either Smith or his criminal companion, Jacob Edmonds, bludgeoned eighty-seven-year-old Mr. Konzelman to death with a three-foot long crowbar. After Edmonds told police that Smith killed Konzelman, the prosecution offered Edmonds a plea deal contingent on his passing a polygraph examination. The results of the polygraph test were inconclusive, but the examiner opined that Edmonds had answered the questions truthfully and Edmonds entered the plea deal in exchange for his testimony against Smith. Despite Smith's request, the prosecution did not reveal the results of Edmonds's polygraph.

Believing that Edmonds had passed the polygraph examination, and knowing that Edmonds would testify against him, Smith entered a no contest plea to felony murder and first-degree robbery. Edmonds has now changed his story and claims that Smith did not kill Mr. Konzelman. Edmonds is unwilling to testify on Smith's behalf, however, because the state has informed him that he will be prosecuted for the capital murder of Mr. Konzelman if he insists on claiming that Smith was not the person who wielded the lethal crowbar. Smith asserts that the state's actions constitute prosecutorial misconduct, and he argues that his failure to exhaust his state court remedies should be excused because Smith can show actual innocence, as well as cause and prejudice.

Although the resolution of these issues is not essential to our analysis, in order to more clearly demonstrate Smith's inability to meet his evidentiary burden, we assume without deciding that two of Smith's arguments have merit: (1) the state committed prosecutorial misconduct by threatening to prosecute Edmonds for capital murder if he testified on

Smith's behalf; and (2) the proper remedy for the prosecutorial misconduct is to compel the state to grant use immunity to Edmonds in an evidentiary hearing where Edmonds would testify that he, not Smith, killed Emmett Konzelman.[1] We do not assume, and we expressly reject, the *Smith* panel majority's decision to treat Edmonds's affidavits as "credible, for purposes of resolving the question whether Smith's procedural default should bar him from presenting his habeas claims on the merits." *Smith*, 466 F.3d at 828. Even indulging the two cited assumptions, however, we conclude that Smith has not satisfied the requirements of *Schlup*'s actual innocence exception with respect to his conviction for felony murder. We also hold that neither the actions of Smith's first state post-conviction trial counsel nor the state's withholding of the results of Edmonds's polygraph examination constitute sufficient cause and prejudice to excuse the procedural default resulting from Smith's failure to exhaust his state remedies.

## I.  Facts and Procedural Background

During the early morning hours of April 4, 1989, after snorting methamphetamine, Smith, Edmonds, and Arlen Bouse[2] decided to steal enough money or property to enable them to purchase tickets for a rock concert the following night. The group drove around several neighborhoods in Edmonds's truck searching for a good target. Ultimately, they discovered a house with the garage door open belonging to Emmett Konzelman and his wife, seventy-four-year-old Elma.

After parking Edmonds's truck near the Konzelmans' resi-

---

[1]We do not endorse the three-judge panel majority's novel addition to our requirement that the prosecution grant use immunity, but merely assume it to show that even under this more stringent standard we must affirm the district court.

[2]The record is unclear as to whether Mr. Bouse's first name is "Arlen" or "Marlin." The district and magistrate judges both used "Arlen," but the sentencing transcript from the state court used "Marlin."

dence, all three men entered the garage. While in the garage, Smith inadvertently caused the door connecting the garage to the house to slam shut. Startled, the group fled from the garage and Bouse was separated from Smith and Edmonds. Bouse took a beer, a hat, and gloves from the garage and returned to the truck to await Edmonds and Smith. Bouse waited at the truck, but Edmonds and Smith did not return for approximately forty-five minutes.

Although accounts of what happened next occasionally conflict, testimony of several witnesses establishes all the factual elements essential to our analysis. Smith and Edmonds returned to the Konzelman residence and burglarized the house. Before entering the house, Smith and Edmonds spent some time in the garage. While there, they found two hats to wear as disguises. One man wore a baseball cap or a skull cap and the other wore a fedora hat. Smith and Edmonds also tied bandannas over their faces while in the garage. Both Smith and Edmonds wore gloves, though it is unclear what kind and how many. Edmonds stated that he wore white latex gloves while Smith wore a pair of black leather gloves. Smith, however, has stated that he wore either one or two brown work gloves. In the garage, Smith and Edmonds also found a three-foot-long crowbar and a rope.

Edmonds provided extensive testimony about what happened in the Konzelmans' residence at Smith's sentencing hearing (Sentencing Hearing) on November 6 and 7, 1989. Smith's attorney cross-examined Edmonds at the Sentencing Hearing.

Q.  Who turned the light on?

A.  Mr. Smith.

Q.  Where were you when he turned that light on?

A.  Standing in the doorway.

Q. Both of you were standing there in the door-way?

A. Right.

Q. Who had the crowbar?

A. Mr. Smith.

Q. What did you have in your hand?

A. A rope.

Q. Why did you take the rope into the bedroom?

A. In case they woke up and tried to call the cops or something.

Q. As the light was turned on, what did you see Mr. Smith do regarding the two people in the room, the other two, Mr. and Mrs. Konzelman?

A. I seen him just, ah, tell 'em to wake up.

Q. You heard that?

A. Yeah.

Q. Did you see them appear to wake up?

A. I seen Mrs. Konzelman appear to wake up, yeah.

Q. Did you see Mr. Konzelman?

A. He didn't wake up right away, so Mrs. Konzelman woke him up.

Q.  What happened next?

A.  He started to get up and Mr. Smith said to lay back down.

Q.  Do you remember how he said that?

A.  "Lay back down, old man."

Q.  Did Mr. Konzelman lay down?

A.  No. I don't think he heard him.

Q.  What did you see Mr. Smith do then?

A.  I seen him make a threatening gesture with the crowbar first.

Q.  And then after he made the gesture what did he do?

A.  I don't know. I said, "I'm getting the fuck out of here."

Q.  While you were in the—still in the room, Mr. Edmonds, did you see anybody hit with that crowbar?

A.  No.

Q.  Did you leave the room or did you stay?

A.  I left the room.

Q.  How far away did you go?

A.  Garage.

A. How long were you gone?

A. Couple minutes, waiting for him to follow me.

Q. Did he follow you out?

A. No.

Q. What did you do then?

A. I went back in to get him.

Q. When you came back in the bedroom, what happened that you could see when you came back in the bedroom?

A. I seen Mr. Konzelman laying on the floor.

* * *

Q. Where was Mrs. Konzelman?

A. Laying on the bed.

Q. Did it appear that anything had happened to either one of those people while you were gone?

A. Mrs. Konzelman, I couldn't tell. Mr. Konzelman, there was blood on the bed.

Q. While you were there in the bedroom did you see Mr. Konzelman move?

A. Yeah, he got back up on the bed.

Q. As he was doing that, what happened?

A. Nothing. He just got back up on the bed and him and he [sic] wife laid together.

Q. Did you see anybody hit after that?

A. No.

Q. When Mr. Konzelman crawled back on the bed did he appear to have been injured?

A. Yeah.

Q. Why?

A. I don't know. He just had a lot of blood all over him.

Q. Did there appear to be blood more in one place than any other place?

A. Yeah, the head.

* * * *

Q. When you first went into the room it didn't appear that either one of those people were hurt or injured when the light first came on?

A. No, they just looked scared.

Q. You saw him gesture toward them, I think was your term? You left the bedroom.

A. Yeah. I said, "Let's get the fuck out of here."

Q. Did Mr. Smith say anything; did he reply to your statement, "Let's get out of here?"

A.   No I didn't give him time. I was gone.

Q.   He could have said, "I'm coming."

A.   He didn't say anything like that.

Q.   But you didn't hear anything?

A.   Right.

Q.   You said in the garage and coming back, then you noted there was injuries?

A.   Yeah.

Q.   At least a lot of blood on the bed?

A.   Yes.

Q.   And blood on Mr. Konzelman?

A.   Right.

Q.   Was there anybody else in the house besides the two Konzelman's and you, and Roger Smith?

A.   No.

Mrs. Konzelman testified at the same hearing, confirming many of the details of Edmonds's testimony.

Q.   After he had come to bed what was the next thing you knew that was going on that wasn't suppose to be happening?

A.   That man standing in my bedroom looking at me.

Q. At that time, Mrs. Konzelman, do you remember one man or two men?

A. There were two men.

Q. Where in your bedroom were they, Ma'am?

A. One was in front of the dresser, the other was in the door.

* * * *

Q. Was the light on or off at that time, Ma'am?

A. I can't tell you that.

Q. At least there was two men. The light must have been on.

A. I can—I could tell—I could see plainly.

Q. When no one answered, did you check to see if your husband was there with you?

A. I did.

Q. Where was he?

A. He was still asleep right beside me.

Q. As far as you can remember—would you tell the Judge what you remember next happening with these two men and with you and your husband?

A. Well, apparently my husband moved as if he were going to—after I awakened him, as if he were going to do something and the guy said,

"Lay down old man." And that's about my last memory. Until I felt (indicating) a hit across my forehead.

The police later found the crowbar in the kitchen and the rope in the bedroom. After the beating, Elma Konzelman lay motionless in her bed until convinced the burglars had left the house. She climbed out of bed and when she realized that the intruders had disabled her phones she found her cane and slowly made her way to a neighbor's house to call for help. Paramedics arrived quickly and rushed the Konzelmans to the hospital. Elma Konzelman required surgery to implant a metal plate in her head, but she survived. Emmett Konzelman died approximately sixteen hours later as a result of his injuries.

Shortly after the attack on the Konzelmans, while the police were interrogating Edmonds about an unrelated offense, Edmonds mentioned that he had attended a Judas Priest concert. An alert police officer recalled that a ticket stub from the same concert was found in the street near the Konzelman residence on the morning following the burglary. Further investigation revealed that the ticket stub belonged to Edmonds and he confessed to participating in the burglary. Edmonds identified Smith and Bouse as his criminal companions and he stated that Smith entered the Konzelmans' bedroom and beat them with the crowbar. Based on Edmonds's description of the events and his apparent credibility,[3] as well as Mrs. Konzelman's statements to police and Smith's history of violent crime, police charged Smith with aggravated murder, felony murder, burglary, two counts of robbery, and two counts of assault.

Because Edmonds provided a statement indicating that

---

[3]When police told Edmonds that they found his ticket stub at the scene, he put his head down on the table and began to cry. In addition, Edmonds made statements to his cellmate in prison that corroborated the version of events Edmonds gave to the police.

Smith beat the Konzelmans, the state offered him a plea agreement contingent on his passing a polygraph examination. The results of the polygraph were inconclusive, but the examiner stated that he believed Edmonds had answered the questions truthfully. As a result, the state entered a plea agreement with Edmonds. Smith believed that Edmonds had passed the polygraph and requested a copy of the results. The prosecution refused to give Smith the polygraph results, however, because it believed that it could not admit the polygraph results as evidence at trial and, thus, it was not required to share them with Smith.

Smith faced prosecution for capital murder and he knew that Edmonds would testify against him. Instead of proceeding to trial, Smith elected to enter a plea agreement whereby he pled no contest to felony murder and one count of robbery. The state agreed to drop the remaining charges against Smith. At Smith's insistence, the state also dropped charges of hindering prosecution against Jeanne Simons, Smith's girlfriend, whom Edmonds had previously implicated in the crime. Although his attorney indicated that he was on some kind of "mild sedative or tranquilizer" during the plea hearing, when questioned by the judge, Smith replied that he did not feel affected by the medication and that he understood what was going on around him. After thoroughly reviewing the charges and likely sentence with Smith, the court accepted Smith's plea. The sentencing judge stated that the evidence in the record was sufficient to satisfy him that Smith "caused the assault" and he imposed a life sentence with a minimum term of 30 years in prison.[4] Thereafter, Smith filed unsuccessful direct appeals with the Oregon Court of Appeals and the Oregon Supreme Court.

Smith then filed a petition for post-conviction relief in the Oregon Circuit Court. He claimed (1) ineffective assistance of

---

[4]Smith does not challenge his sentence in the current federal habeas petition.

counsel because his trial lawyer failed to properly advise him of potential defenses and "hounded" Smith into pleading no contest, and (2) a violation of his due process rights both because Edmonds's plea bargain wrongfully exposed Smith to "greater consequences for his acts than are legally justifiable" and because Smith was on drugs when he entered his plea, thus rendering it unknowing and involuntary, notwithstanding his contemporaneous report that he felt unaffected by the drugs. The Oregon Circuit Court denied Smith's petition on the merits and also denied his request for appointment of new counsel.

The Oregon Court of Appeals appointed new counsel for Smith. On appeal, however, Smith argued only that the Oregon Circuit Court that heard his post-conviction claims should have appointed new counsel for him; he did not challenge the denial of his substantive post-conviction claims on the merits. The Oregon Court of Appeals affirmed without opinion the Circuit Court's refusal to appoint new counsel for Smith and the Oregon Supreme Court denied review. Accordingly, Smith never presented his substantive post-conviction claims to the Oregon Supreme Court, and thus they are procedurally defaulted.

Meanwhile, Edmonds completed his sentence for the Konzelman robbery and was released from prison. In 1992, Edmonds was arrested on various charges of rape, sodomy, and kidnapping with a firearm, to which he pleaded no contest and was sentenced to life in prison.

On February 16, 1996, Edmonds signed an affidavit reading, in pertinent part:

> On April 4, 1989, myself, Roger Smith and Arlen Bouse were involved in a residential burglary. On the above date mentioned Emmit Konzleman [sic] was bludgeoned to death at the adress [sic] of 3030 South Shore Drive, Albany, OR.

After all incidents occured [sic] and I had been apprehended and taken into custody. [sic] I stated in a sworn statement that Roger Smith was my code-fendent and had in fact bludgeoned Emmit Konzle-man [sic] to death.

I would like to, for the record [sic] retract that statement. Roger Smith did not kill Emmit Konzle-man. [sic]

I am confessing right now that I committed pur-gory [sic] with full knowledge of the consequences.

The reason I lied under oath was because my attorney of record at the time Thomas Hill led me to believe that Roger Smith was about to testify and leave me to do a life sentence for a crime I did not commit.

The only way for me to set the record straight is to write this confession now.

Based on Edmonds's recantation, Smith again sought post-conviction relief in state court claiming that the recantation constituted new exculpatory evidence. Smith also claimed that his due process rights were violated because his trial counsel failed to explain the difference between aggravated murder and felony murder, and, given his below-average intelligence and his use of drugs, the trial court further failed to adequately explain the charges against him. The Oregon Circuit Court granted summary judgment for the state and Smith appealed. While the appeal was pending, Smith filed a motion for voluntary dismissal, apparently because he grew frustrated with his attorney and the delays caused by the court granting extensions of time. The court granted Smith's motion for voluntary dismissal of his state claims and Smith turned to federal court.

In 1997, Smith filed a petition for writ of habeas corpus in the federal district court. Smith raised four substantive claims

in his federal habeas petition: (1) the plea resulting in his conviction was not knowing and voluntary; (2) ineffective assistance of counsel during the investigative and trial preparation stages of his case; (3) ineffective assistance of counsel during the plea negotiation/entry stage; and (4) ineffective assistance of counsel in hearings before the Oregon Circuit Court.

While Smith's federal habeas petition was pending, he received another affidavit from Edmonds, dated July 24, 2001. That affidavit reads in pertinent part:

1. On April 4, 1989, I participated in a residential burglary at 3030 Southshore Drive in Albany, Oregon, along with Roger Smith and Arlen Bouse.

2. I clearly recall the events relating to the burglary and this affidavit is based entirely on my first hand knowledge of those events.

3. During the course of the burglary, an elderly resident of the home, Mr. Emmit Konzleman [sic], was bludgeoned to death.

4. In the underlying prosecution of Mr. Smith and myself, I falsely stated, under oath, that Mr. Smith had bludgeoned Mr. Konzleman [sic], when in fact I knew that he had not.

5. I recognize that my false sworn statement was an act of perjury, and I acknowledged this when I sent a sworn recantation to the Linn County District Attorney in 1996.

6. I know that Mr. Smith did not bludgeon or otherwise strike Mr. Konzleman [sic] and I know that Mr. Smith never entered the Konzleman's bedroom, where the killing occurred.

7. I was motivated to falsely implicate Mr. Smith because my trial attorney and others counseled that, by doing so, I could avoid prosecution for murder or aggravated murder.

8. As a part of my plea agreement in the underlying case, I was required to take a polygraph concerning the murder and I was told that I neither passed or failed that test but that the results were inconclusive.

After receiving the new affidavit from Edmonds, Smith amended his federal habeas petition to include two additional claims: (1) Smith's conviction was unconstitutional because he was actually innocent of felony murder; and (2) Smith's due process rights were violated under *Brady v. Maryland*, 373 U.S. 83 (1963), when the prosecution made a deal with the actual killer and failed to produce the results of Edmonds's polygraph test when requested.

After receiving a copy of Edmonds's second affidavit, a state prosecutor met with Edmonds and his newly appointed counsel. The prosecutor informed Edmonds that if he insisted on testifying in accordance with his recantations, the state would seek to set aside his plea agreement in this case, subjecting Edmonds to capital murder charges for killing Emmett Konzelman. If, however, Edmonds reaffirmed his original testimony identifying Smith as the killer, the state would agree not to pursue perjury charges based on the contents of the affidavits. Edmonds conferred with counsel and decided to invoke his Fifth Amendment rights and refused to testify.

Smith argued that the state's actions constituted prosecutorial misconduct intended to distort the fact-finding process and he requested that the federal district court order an evidentiary hearing and compel the state to grant use immunity[5]

---

[5]When a witness receives a grant of use immunity, "while the government may prosecute the witness for an offense related to the subject matter

to Edmonds under *United States v. Westerdahl*, 945 F.2d 1083 (9th Cir. 1991). The federal district court rejected Smith's claim of prosecutorial misconduct and denied his request for an evidentiary hearing. The district court held that it was unable to reach the merits of Smith's habeas petition because Smith had failed to exhaust his claims in state court. The district court also concluded that Smith's failure to properly exhaust his state court remedies constituted procedural default, which Smith could not overcome because he had failed to demonstrate either actual innocence or cause and prejudice. Smith appealed to this court.

A majority of a three-judge panel of this court held that "because prosecutorial misconduct in connection with his federal habeas proceedings seriously interfered with Smith's ability to make the necessary showing under *Schlup*, and because the resultant harm cannot be effectively remedied by less intrusive means, the exculpatory testimony withheld from the court as a result of the state's actions must be presumed to be true." *Smith*, 466 F.3d at 806-07. As a result, the panel majority concluded that "Smith satisfies the *Schlup* 'actual innocence' standard for overcoming a procedural default of his claims insofar as they relate to his felony murder conviction . . . and thus Smith is entitled to proceed with his constitutional claims." *Id.* at 807. The dissenting judge argued that, even assuming prosecutorial misconduct, "the evidence in this case is still insufficient to qualify Smith for *Schlup v. Delo*'s actual innocence gateway." *Id.* at 829 (Bybee, J., dissenting).

We agreed to rehear this case en banc. We focus our analysis primarily on whether Smith can overcome his procedural default either by demonstrating actual innocence under *Schlup*

---

of the witness's testimony, the testimony itself and any 'fruits' thereof may not be used against the witness in any criminal case except a prosecution for perjury arising out of the testimony." *United States v. Lord*, 711 F.2d 887, 890 (9th Cir. 1983).

or by establishing cause and prejudice. Because we hold that Smith fails on both counts, we affirm the decision of the district court.

## II. Standard of Review and Jurisdiction

Smith's federal habeas petition was filed after April 24, 1996, and is thus governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254. *Woodford v. Garceau*, 538 U.S. 202, 204, 210 (2003). We review de novo the district court's decision to dismiss the federal habeas petition for procedural default. *Manning v. Foster*, 224 F.3d 1129, 1132 (9th Cir. 2000). The district court's denial of an evidentiary hearing pursuant to AEDPA is reviewed for abuse of discretion. *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004). We review the district court's relevant factual findings for clear error. *Barajas v. Wise*, 481 F.3d 734, 738 (9th Cir. 2007).

We have appellate jurisdiction over the district court's denial of the petition under 28 U.S.C. § 2253.

## III. Analysis

Smith's amended federal habeas petition raised six claims: (1) lack of a knowing and voluntary plea; (2) ineffective assistance of counsel during the investigative and trial preparation stages of this case; (3) ineffective assistance of counsel during the plea negotiation/entry stage of this case; (4) ineffective assistance of counsel in hearings before the Oregon Circuit Court; (5) actual innocence of felony murder, rendering Smith's conviction unconstitutional; and (6) violation of Smith's due process rights under *Brady v. Maryland*, 373 U.S. 83 (1963), when the prosecution made a deal with the actual killer and failed to comply with Smith's request to produce the results of Edmonds's polygraph test. The district court declined to address these claims on the merits because it determined that they were procedurally defaulted. The district

court also denied Smith's request for an evidentiary hearing and found that the state did not commit prosecutorial misconduct leading to Edmonds's decision not to testify on behalf of Smith.

On appeal, Smith argues that (1) his federal habeas claims are not procedurally defaulted, (2) even if they are defaulted, such default is excused because of actual innocence as well as cause and prejudice, (3) Smith is at least entitled to an evidentiary hearing, and (4) the state committed prosecutorial misconduct.

Given our holding in this case and because it highlights the weakness of Smith's case, we assume, arguendo, that Smith is entitled to an evidentiary hearing and that the state committed prosecutorial misconduct. As noted, however, we do not presume Edmonds's affidavits to be "credible, for purposes of resolving the question whether Smith's procedural default should bar him from presenting his habeas claims on the merits," as required by the panel majority. *Smith*, 466 F.3d at 828. Even if we assume that the state committed prosecutorial misconduct by threatening to seek the death penalty against Edmonds if he testified on behalf of Smith, and that the state should be forced to grant use immunity to Edmonds at an evidentiary hearing at which he would testify that he, rather than Smith, killed Mr. Konzelman, Smith still cannot overcome his procedural default because he cannot show either actual innocence of felony murder or cause and prejudice from the default.

### A. Smith's federal habeas claims are procedurally defaulted.

[1] Before a federal court may consider the merits of a state prisoner's petition for a writ of habeas corpus, the prisoner generally must first exhaust his available state court remedies. 28 U.S.C. § 2254(b); *see also Rose v. Lundy*, 455 U.S. 509, 515 (1982). If the petitioner fails to present his federal claims

to the state's highest court, and if he is procedurally barred from presenting those claims to the appropriate state court at the time of filing his federal habeas petition, the petitioner's claims are considered procedurally defaulted for purposes of federal habeas review. *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999).

**[2]** Smith raises several constitutional claims in his federal habeas petition, none of which he properly exhausted in state court. In his first round of state post-conviction proceedings, Smith abandoned all substantive claims and challenged on appeal only the denial of his motion for new counsel by the state trial court on post-conviction review. Smith abandoned all federal claims raised in his second post-conviction action when the court granted his motion to voluntarily dismiss the appeal.[6] Accordingly, Smith's federal habeas claims are not properly exhausted. In addition, his claims are procedurally defaulted for federal habeas purposes because Oregon's time limit for filing petitions for post-conviction relief bar Smith from now returning to state court to exhaust his remedies. Or. Rev. Stat. § 138.510(3) (2005).

Smith presents two arguments on appeal to excuse his failure to raise his claims before the Oregon courts, neither of which help him. Smith notes that, despite a petitioner's failure to exhaust his state remedies, a federal court will consider the merits of a federal habeas petition when "circumstances exist that render [the state post-conviction] process ineffective to protect the rights of the applicant." 28 U.S.C. § 2254(b)(1)(B)(ii). First, Smith argues that Oregon's post-conviction process was ineffective because, with respect to his first petition, the original post-conviction court denied his request for new counsel and, on appeal, the state court denied Smith's request to depose his trial counsel and the prosecutor. Second, Smith

---

[6]Smith did properly exhaust on direct review his Eighth Amendment challenge to the length of his sentence, but he does not raise that claim in his federal habeas petition.

argues that Oregon's post-conviction process was ineffective because the post-conviction trial court denied his second petition by holding that it could not allow relief based on newly-discovered evidence of actual innocence under Or. Rev. Stat. § 138.530(1) (2005).[7] Smith claims that this ruling establishes that Oregon's post-conviction process was ineffective to protect his rights because it prevents the state post-conviction court from considering evidence of actual innocence. Therefore, Smith argues that his failure to exhaust state remedies should be excused under 28 U.S.C. § 2254(b)(1)(B)(ii).

[3] We need not reach the merits of either of these arguments, however, because these excuses for failure to exhaust are irrelevant to our present inquiry. Smith needs no excuse from the exhaustion requirement because he has technically exhausted his state remedies through his procedural default. The Supreme Court has noted that "[a] habeas petitioner who has defaulted his federal claims in state court meets the technical requirements for exhaustion; there are no state remedies any longer 'available' to him." *Coleman v. Thompson*, 501 U.S. 722, 732 (1991). In cases such as this, where a petitioner

---

[7]Or. Rev. Stat. § 138.530(1) (2005):

(1)   Post-conviction relief pursuant to ORS 138.510 to 138.680 shall be granted by the court when one or more of the following grounds is established by the petitioner:

   (a) A substantial denial in the proceedings resulting in petitioner's conviction, or in the appellate review thereof, of petitioner's rights under the Constitution of the United States, or under the Constitution of the State of Oregon, or both, and which denial rendered the conviction void.

   (b) Lack of jurisdiction of the court to impose the judgment rendered upon petitioner's conviction.

   (c) Sentence in excess of, or otherwise not in accordance with, the sentence authorized by law for the crime of which petitioner was convicted; or unconstitutionality of such sentence.

   (d) Unconstitutionality of the statute making criminal the acts for which petitioner was convicted.

did not properly exhaust state remedies and "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred," the petitioner's claim is procedurally defaulted. *Id.* at 735 n.1. In light of the procedural bar to Smith returning to state court to exhaust his state remedies properly, the relevant question becomes whether Smith's procedural default can be excused, not whether Smith's failure to exhaust can be excused. Therefore, the exceptions to the exhaustion requirement set forth in § 2254(b) are irrelevant to Smith's petition. Rather, we must determine whether we can excuse Smith's procedural default under the applicable exception to that rule.

### B. Smith cannot overcome his procedural default.

**[4]** On federal habeas review under AEDPA, generally "[w]e may not reach the merits of procedurally defaulted claims." *Williams v. Stewart*, 441 F.3d 1030, 1061 (9th Cir. 2006) (per curiam). However, a petitioner can overcome procedural default and obtain federal review of the merits of his claim in one of two ways. First, a petitioner overcomes procedural default if he presents sufficient evidence to "demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. To make this showing, a petitioner's case must fall within the "narrow class of cases . . . [involving] extraordinary instances when a constitutional violation probably has caused the conviction of one innocent of the crime." *McCleskey v. Zant*, 499 U.S. 467, 494 (1991). Second, a petitioner may overcome procedural default by making "an adequate showing of cause and prejudice" for his failure to exhaust his state court remedies. *Strickler v. Greene*, 527 U.S. 263, 282 (1999). Because we conclude that Smith has demonstrated neither actual innocence nor cause and prejudice, we cannot consider the merits of Smith's procedurally defaulted federal habeas petition.

## 1. *Actual Innocence*

We will excuse Smith's procedural default if he can make the requisite showing of actual innocence of his conviction for felony murder. *See Schlup*, 513 U.S. at 315-16.[8] In this context, Smith's "claim of innocence . . . is procedural, rather than substantive" because it allows him to overcome procedural default to obtain federal review of his substantive constitutional claims on the merits. *Id.* at 314. Such a "claim of innocence is thus 'not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits.' " *Id.* at 315 (quoting *Herrera v. Collins*, 506 U.S. 390, 404 (1993)). In order to pass through the actual innocence procedural gateway of *Schlup*, Smith must show that, in light of all available evidence, it is more likely than not that no reasonable juror would convict him of the relevant crime. *See House v. Bell*, 126 S. Ct. 2064, 2076-77 (2006).[9]

---

[8]Based on the briefs, record, and oral argument, we conclude that Smith challenges only the procedural default with respect to his conviction for felony murder and not with respect to his conviction for robbery. Smith does not offer any facts or arguments to support a claim of actual innocence of the robbery conviction or to otherwise excuse his procedural default concerning that conviction.

[9]We recognize that in *Schlup* the Supreme Court made the actual innocence gateway available to a federal habeas petitioner who was convicted following *a jury trial*, while in this case, Smith entered a *no contest plea* in state court rather than proceeding to trial. We are aware of a potential incongruity between the purpose of the actual innocence gateway announced in *Schlup* and its application to cases involving guilty (or no contest) pleas. *See Bousley v. United States*, 523 U.S. 614, 629-36 (1998) (Scalia, J., dissenting). For purposes of our analysis, however, we assume without deciding that the actual innocence gateway is available to Smith. We do not determine whether the *Schlup* actual innocence gateway always applies to petitioners who plead guilty (or no contest), but in this case, the state has not raised the argument and, more importantly, Smith has failed to satisfy the requirements of *Schlup*. Thus, the question is ultimately irrelevant for purposes of the habeas petition under consideration.

**[5]** In this case, Smith pled no contest to felony murder, an offense with which he was charged because Emmett Konzelman was killed in the course of the burglary committed by Smith and Edmonds. Smith does not dispute his involvement in the burglary, but instead rests his actual innocence claim on Oregon's affirmative defense to felony murder, which has five statutory elements. *See* Or. Rev. Stat. § 163.115(3) (2005). Had Smith gone to trial on the felony murder charge, he would have had the burden of proving all five elements of the affirmative defense by a preponderance of the evidence. *Id.* § 161.055(2). Accordingly, to pass through the *Schlup* actual innocence gateway, Smith must prove that it is more likely than not that no reasonable juror would have found that he failed to establish *any* of the five elements of the affirmative defense by a preponderance of the evidence. *See Jaramillo v. Stewart*, 340 F.3d 877, 882-83 (9th Cir. 2003); *Griffin v. Johnson*, 350 F.3d 956, 963-64 (9th Cir. 2003).

**[6]** Oregon's statutory affirmative defense to felony murder requires Smith to prove that he:

(a) Was not the only participant in the underlying crime;

(b) Did not commit the homicidal act or in any way solicit, request, command, importune, cause or aid in the commission thereof;

(c) Was not armed with a dangerous or deadly weapon;

(d) Had no reasonable ground to believe that any other participant was armed with a dangerous or deadly weapon; and

(e) Had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death.

Or. Rev. Stat. § 163.115(3). Because Smith and Edmonds both participated in the burglary of the Konzelman residence, the state does not dispute that Smith has established element (a). Each of the remaining four elements is contested. Even though we assume, arguendo, that the state engaged in prosecutorial misconduct and that Edmonds would testify at that hearing that he, not Smith, was the true killer, we hold that Smith cannot meet his high burden of establishing actual innocence of felony murder under *Schlup* because he cannot meet the requisite evidentiary burden for all five elements of his affirmative defense to take advantage of the gateway. Specifically, Smith cannot meet his burden under elements (b), (c), or (d).

### (b)  "Did not commit the homicidal act"

**[7]** The second element of the affirmative defense requires Smith to prove, by a preponderance of the evidence, that he was not Mr. Konzelman's actual killer. Or. Rev. Stat. § 163.115(3)(b). We have assumed for purposes of this analysis that, granted use immunity, Edmonds would testify to this effect. We do not assume, however, that every reasonable juror would believe him.

Edmonds, taking the stand in Smith's defense, would be confronted with the numerous inconsistent statements he has made under oath and to his cellmate in prison. He would have his contradictory statements to the police read into the record to impeach his credibility. He would be forced to refute his prior testimony at Smith's Sentencing Hearing, where he recounted, in detail, seeing Smith with the crowbar in his hand and threatening Mr. Konzelman, leaving, and returning to find Mr. Konzelman battered on the floor and a pool of blood on the bed where he had been lying. *See* Fed. R. Evid. 801(d)(1) (admitting prior statements to prove the truth of the matter asserted therein where declarant testified under oath and was subject to cross examination). This refutation would be no less difficult for the fact that his prior testimony is sub-

stantially corroborated by that of Mrs. Konzelman, the only surviving victim of what occurred in the Konzelmans' bedroom. Edmonds's prior testimony that Smith woke the Konzelmans by turning on the lights and that he was standing behind Smith in the doorway when Smith entered the room, his description of the confrontation between Mr. Konzelman and Smith, and his statement that he left the doorway shortly before the beating occurred, all correspond to Mrs. Konzelman's description of the same events, given in the same proceeding. The fact that the police found the rope (which Edmonds admitted to carrying) in the bedroom is further evidence that he was there.

Even Edmonds's wholesale disavowal of parts of his previous testimony would not exculpate Smith. Edmonds would, for example, have to reconcile the inconsistencies in the two affidavits. In his February 1996 affidavit, Edmonds wrote both that "Roger Smith did not kill Emmit Konzleman [sic]" and that Edmonds lied because "Roger Smith was about to testify and leave [Edmonds] to do a life sentence for a crime [Edmonds] did not commit." It is undisputed, however, that one of them was the killer. His second, 2001 affidavit, on the other hand, states merely that he committed perjury to avoid being sent to prison. This would be consistent with the first statement of his 1996 affidavit, but in tension with the second. That second affidavit, which states categorically that "Mr. Smith never entered the Konzleman's [sic] bedroom, where the killing occurred," also contradicts Mrs. Konzelman's testimony that *both* burglars were in the room at one point, as well as what Edmonds told the police under oath, and what he told his cellmate while he was in prison.

**[8]** Edmonds would also have to convince the jurors that they should believe him now, with no corroborating evidence, when the statute of limitations on perjury has expired,[10] and

---

[10]A perjury charge for Edmonds's testimony at Smith's Sentencing Hearing would be barred by the statute of limitations.

when he is serving a life term in prison, meaning that he faces almost no consequences for lying to them now. Why would a reasonable juror believe Edmonds, knowing that he was facing yet another story spun by a drug addict, kidnapper, rapist, and admitted perjurer who, because of his current life sentence, can now lie with impunity? Smith must not only show that such a juror would find it more likely than not that Edmonds was lying in his statements to the police, his cellmate, and to the court in his Sentencing Hearing testimony; he must also show that *every* reasonable juror would find it more likely than not that Edmonds, at long last, has decided to tell the truth. We do not find it more likely than not that every juror would do so.

**[9]** Edmonds's recantation changes little. A reasonable juror would still have sufficient evidence to believe that Smith was more likely than not the real killer, and Smith certainly cannot meet his burden by a preponderance of the evidence.[11]

---

[11]Curiously, our dissenting colleagues are unhappy that we make what they refer to as "credibility findings," Reinhardt, J., dis. op. at 16695, in evaluating evidence a reasonable juror might review in making a *Schlup* "actual innocence" determination in this case. They had no hesitancy in making similar determinations themselves when they participated as en banc members of the majority making a *Schlup* "actual innocence" evaluation in *Carriger v. Stewart*, 132 F.3d 463 (9th Cir. 1997) (en banc). In *Carriger*, the allegedly exculpating witness had originally testified against the petitioner, then testified in a post-conviction proceeding that he, himself, was the real murderer, then retracted the confession three weeks later. *Id.* at 471-72. By the time the petitioner made a *Schlup* actual innocence argument, the exculpating witness was unavailable to testify because he was dead. *Id.* at 472-73. Nonetheless, the *Carriger* court deemed the confession credible—when neither the state court nor federal district court in the *Schlup* proceeding had witnessed it—and deem its subsequent retraction incredible. *Id.* at 473-76. Notably, the majority stated, "the fact that [the accusing witness] confessed without immunity and overwhelmingly against his own penal interest is a strong indicator of his reliability." *Id.* at 475. We respectfully suggest that our dissenting colleagues are being inconsistent when they criticize us for drawing the opposite inference with respect to a witness who thought he could recant, and possibly help his partner in crime, without any personal consequences.

Perhaps it is for this reason that our dissenting colleagues (and the original panel majority) would have us adopt the novel approach of simply accepting Edmonds's affidavits at face value, declaring them to exculpate Smith, and proceeding to a hearing on his constitutional claims—a remedy with no support in relevant precedent. The dissents' (and the original panel majority's) remedy goes well beyond the *Schlup* actual innocence excuse for procedural default. Instead, the dissenters (and the original *Smith* majority) appear to have fashioned an additional, independent excuse that opens the gateway for defendants alleging serious prosecutorial misconduct to proceed to the merits of their cases without complying with AEDPA's exhaustion requirements. That is not the law, and, left unchanged, could potentially open a gaping hole in AEDPA's jurisdictional and exhaustion framework. It was that error in law, combined with the panel's other misconstructions of the *Schlup* gateway, not "the factual question whether the evidence does or does not support an affirmative defense," Reinhardt, J., dis. op. at 16701, that required our en banc review. The *Schlup* gateway exists only for those who can demonstrate their actual innocence, which Smith cannot do under Oregon law.

*(c)    "Was not armed with a dangerous or deadly weapon"*

**[10]** The third element of the affirmative defense requires Smith to prove, by a preponderance of the evidence, that he "[w]as not armed with a dangerous or deadly weapon." Or. Rev. Stat. § 163.115(3)(c). We note that the retraction in both

---

Further, we note that this is not a true "credibility finding" based on a lower court's direct observation of a witness on the stand. It is quite the opposite, in fact—here, we evaluate potential testimony that no judge or jury has ever heard. It does not matter to our analysis whether the witness is actually telling the truth—the purpose of a credibility determination—but rather we care only whether all reasonable jurors would choose to believe the proffered testimony.

of Edmonds's affidavits is limited to his "sworn statement" but makes no reference to his testimony at Smith's Sentencing Hearing or what he told his cellmate. Moreover, while some of the statements in the affidavit flatly contradict parts of his Sentencing Hearing testimony (for example, that "Mr. Smith did not bludgeon or otherwise strike Mr. Konzleman [sic] and . . . that Mr. Smith never entered the Konzleman's [sic] bedroom, where the killing occurred"), it is completely silent about the rest of his statements. If a reasonable juror could somehow manage to believe every word in both Edmonds's affidavits, he or she could still find much to believe in Edmonds's Sentencing Hearing testimony that is not mentioned or contradicted in either affidavit.

**[11]** For example, at the Sentencing Hearing, Edmonds testified that he found Smith holding the crowbar in the Konzelmans' bedroom, and that he shortly thereafter threatened Mr. Konzelman with it. While he has disavowed his statement that Smith was in the Konzelmans' bedroom, he has not changed his story that Smith was holding the crowbar. A reasonable juror could still credit this part of Edmonds's Sentencing Hearing testimony, and find that Smith, at some point in the evening, held the crowbar. A reasonable juror who found it as likely as not that Smith held the crowbar at some point in the evening would be compelled to find that Smith had failed to establish the third element of his affirmative defense, and find Smith guilty.

*(d)    "Had no reasonable ground to believe that [Edmonds] was armed with a dangerous or deadly weapon"*

**[12]** The fourth element of the affirmative defense requires Smith to show that he "[h]ad no reasonable ground to believe that any other participant was armed with a dangerous or deadly weapon." Or. Rev. Stat. § 163.115(3)(d). Even assuming that a reasonable juror really believed the core of Edmonds's new story—that he, not Smith, was the true killer —the record demonstrates that such a juror would still con-

clude that Smith had reason to believe that Edmonds was armed with a dangerous weapon, and thus that Smith's affirmative defense to felony murder fails.

**[13]** It is undisputed that Emmett Konzelman died as a result of being beaten with a three-foot-long crowbar at the hands of either Smith or Edmonds. Assuming that Edmonds was the killer, we do not believe that all reasonable jurors would find by a preponderance of the evidence that Edmonds successfully concealed such a large, curve-ended weapon from Smith's sight (three feet being almost the length of an average baseball bat) during the forty-five minutes that Edmonds and Smith were in the garage and burglarizing the home.

It is undisputed that the crowbar came from the Konzelmans' garage. Smith and Edmonds were in the garage together planning their criminal enterprise for some time before entering the house. Although the garage was dark, the record suggests that Edmonds may have had a lighter and Smith a flashlight. Whatever the light source, the record indicates that Smith and Edmonds must have had sufficient light to identify various objects within the garage, since they found and removed from the garage, among other things, the hats they wore to disguise themselves, the rope, and the crowbar. If Edmonds located and removed the crowbar in the garage before entering the house, a reasonable juror could easily conclude that Smith saw the crowbar at that time.

A reasonable juror could find that Smith and Edmonds entered the house at or around the same time. In one account, Edmonds told police that he and Smith "masked ourselves with bandanas and . . . we went in the house." In another statement, Edmonds stated that he and Smith were together in the living room immediately after entering the house. At Smith's Sentencing Hearing, Edmonds testified that he entered the house first and Smith followed right behind him.[12]

---

[12]At the Sentencing Hearing, Edmonds, contradicting his statement to the police, denied being near Smith during much of the burglary. A rea-

Neither recantation addresses this issue. A reasonable juror would likely conclude that it would have been highly improbable that Smith could have avoided seeing Edmonds carrying a three-foot crowbar, either when they entered the house at approximately the same time, or later while together in the house, especially when the light was turned on.

The record also contains evidence that Smith had reason to know that Edmonds was armed with the crowbar when he was in the Konzelmans' bedroom. Mrs. Konzelman testified that when she awoke, she saw the attacker standing next to the dresser in the bedroom while the other burglar briefly stood in the bedroom doorway, before proceeding down the hallway. Mrs. Konzelman also testified that the attacker picked up the crowbar from the ground before he began striking Mr. Konzelman. Assuming Edmonds was the killer, a reasonable juror could conclude that Smith saw the crowbar in the bedroom, even if Edmonds was not holding it in his hand when Smith briefly stopped at the bedroom door before the attack. Furthermore, it is entirely plausible that Smith returned to the bedroom doorway when he heard the beating, or that he moved to a vantage point in the hallway from which he was not visible to Mrs. Konzelman but could still see the attack. None of these scenarios is contradicted by the evidence, including Edmonds's two recantation affidavits. Based on this evidence, a reasonable juror could find that Smith had reason to know that Edmonds was armed when in the bedroom where he initiated the fatal attack.

---

sonable juror who thought that Edmonds was "attempting to pin the murder on his partner in the robbery," Reinhardt, J., dis. op. at 16702, might conclude that the earlier version of the story, where the two were together in the house, is the true statement. It would only be natural that a burglar, trying to exculpate himself, would lie to place as much distance as possible between himself and his accomplice (and, by extension, the killing). It would make little sense, by contrast, to lie about the two being in the same room together when they were not.

In addition, Smith admitted that he took a rope from the garage and brought it into the Konzelman residence. The rope was later found on the bedroom floor and the crowbar was discovered in the kitchen. Accordingly, even assuming that Edmonds carried the crowbar and Smith the rope, the ultimate placement of the objects permits the reasonable inference that Smith and Edmonds crossed paths while Edmonds had the crowbar and Smith the rope, or that Edmonds took the rope from Smith at some point before the beating.

Smith also entered a plea of no contest to the robbery charge, which alleged that "the said defendant(s) . . . did use a dangerous weapon, to-wit: a crowbar . . . ." It makes no difference whether Smith's plea meant that Edmonds used the crowbar (as opposed to Smith); it constituted an admission that he knew the crowbar was used.

**[14]** Judge Reinhardt's dissent criticizes us for "relying almost entirely on Edmonds's past statements" in determining what really occurred that night. Reinhardt, J., dis. op. at 16695. Our colleagues are mistaken. We conclude only that at least one reasonable juror—even one who believes Edmonds's new story that Smith did not wield the crowbar— could still credit Edmonds's earlier statements on more ancillary matters, even in the light of contradictory contemporaneous testimony. While it might be reasonable to infer that a "probable killer . . . attempting to pin the murder on his partner in the robbery," Reinhardt, J., dis. op. at 16702, would lie about who actually crushed Mr. Konzelman's skull with a crowbar, a reasonable juror might nonetheless believe that Edmonds was originally telling the truth about such things as whether they entered the house together or separately—and, if Edmonds testified differently today, that he would be lying now only to exculpate his friend.

But, as Judge Reinhardt's dissent notes, Edmonds would not be alone—Smith himself could testify about the circumstances of the crime. His 1992 deposition testimony in his ini-

tial post-conviction proceeding, however, would undermine any current claim that he was unaware that Edmonds had a crowbar with him in the house. One of Smith's habeas claims was that trial counsel had failed to properly pursue and advise him about possible defenses. At the outset of the deposition, counsel for the State Attorney General explained to Smith that "[t]his is my opportunity to clarify what you are complaining about in your petition." When asked "what defenses do you think that you had to this crime," Smith stated that trial counsel should have "raised the evidence" that "Edmonds did it and not me." When Smith was asked whether there were any other defenses, Smith said he was not "legally adapted" to respond. State counsel then offered to let Smith consult with his lawyer:

> Well, do you need to talk to your attorney to get some idea of some other legal defenses that you think he should have raised because this is the only chance you're going to get to tell me what you . . . .

The parties went off the record and Smith consulted with his attorney. After noting for the record that Smith had consulted with his counsel, the State attorney asked again, "What other defenses do you think trial counsel should have raised on your behalf?" Smith responded:

> A.  He should have raised the defense that what happened that night was not intended to happen.
>
> Q.  You mean Mr. Edmonds didn't intend to kill those people?
>
> A.  Yeah.

Smith's counsel clarified, "I think what he means is that *he* [Smith] didn't intend to kill anybody." State counsel then interjected, "But he told me earlier that Mr. Edmonds did the killing, not him;" whereupon Smith further explained, "Well,

like I didn't know that he was going to do it." Smith was given additional opportunities to raise other defenses his trial attorney should have raised, but not once during this deposition did he state that he had no reason to believe that Edmonds had the crowbar.

If Smith was unaware that Edmonds had the crowbar—as opposed to being unaware Edmonds had the intent to use the crowbar to kill—he likely would have said so. That he did not say so when given ample opportunity leads to the conclusion either that he knew that Edmonds had a crowbar or that Smith himself went into the bedroom with the crowbar. Throughout the plea colloquy, two-day Sentencing Hearing, and his 1992 deposition, Smith never made the simple statement that he did not know and had no reason to believe a crowbar had been brought into the Konzelmans' bedroom. The reason for this is obvious.

[15] In sum, even assuming that, as a result of prosecutorial misconduct, Edmonds would be entitled to use immunity at an evidentiary hearing at which he would testify in accordance with his recantations that he, not Smith, held the crowbar, and even assuming that, notwithstanding his former sworn testimony, the jury believed him, it is more likely than not that a reasonable juror would conclude that Smith failed to establish by a preponderance of the evidence that he "[h]ad no reasonable ground to believe that any other participant was armed with a dangerous or deadly weapon." Or. Rev. Stat. § 163.115(3)(d). Even if Edmonds could convince a reasonable juror that he, not Smith, was the killer, that reasonable juror would still conclude that Smith had reason to know that Edmonds was armed with a three-foot-long crowbar during the burglary. Because a reasonable juror would conclude that Smith failed to prove this element of his affirmative defense by a preponderance of the evidence, Smith cannot pass through the *Schlup* gateway.

## 2.  *Cause and Prejudice*

Although Smith has failed to show actual innocence under *Schlup*, he can still overcome his procedural default if he makes "an adequate showing of cause and prejudice" relating to his failure to exhaust his state court remedies. *Strickler*, 527 U.S. at 282. To make this showing, Smith must "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law." *Coleman*, 501 U.S. at 750. Smith argues that his procedural default is excused based on cause and prejudice because (1) his state post-conviction counsel was ineffective, and (2) the prosecution committed *Brady* error by wrongfully withholding Edmonds's polygraph results. Both arguments fail.

Smith argues that cause exists to excuse his procedural default because his first post-conviction counsel abandoned his role as Smith's legal representative by failing to depose Smith's trial counsel, the trial prosecutor, and the jail doctor. At the first post-conviction trial proceedings, the state introduced affidavits from Smith's trial counsel and the trial prosecutor, and Smith argues that his post-conviction counsel's decision not to question these witnesses in a prior deposition constituted ineffective assistance. In response to the court's questioning, Smith's post-conviction counsel explained that he did not depose these witnesses because they would not provide any assistance to Smith's case. He stated that "it would be to Mr. Smith's detriment to question these people further because, in my opinion, they would only further damage his case rather than help." Smith argues that his counsel's inaction prevented Smith from properly presenting his substantive post-conviction claims in state court,[13] thus constituting cause for his procedural default.

---

[13]In his first state post-conviction petition, Smith alleged (1) ineffective assistance of counsel because his trial lawyer failed to properly advise him of potential defenses and "hounded" Smith into pleading no contest, and (2) the violation of his due process rights because Edmonds's plea bargain wrongfully exposed Smith to "greater consequences for his acts than are legally justifiable" and because Smith was on drugs when he entered his plea, thus rendering it unknowing and involuntary.

In order to establish cause for a procedural default, a petitioner must demonstrate that the default is due to an external objective factor that " 'cannot fairly be attributed to him.' " *Manning*, 224 F.3d at 1133 (quoting *Coleman*, 501 U.S. at 753). Because "[t]here is no constitutional right to an attorney in state post-conviction proceedings," *Coleman*, 501 U.S. at 752, attorney ineffectiveness "in the post-conviction process is not considered cause for the purposes of excusing the procedural default at that stage," *Manning*, 224 F.3d at 1133. As the Supreme Court has established, counsel acts as the petitioner's agent and thus any attorney error in post-conviction proceedings is generally attributable to the petitioner himself. *See Coleman*, 501 U.S. at 752-53.

**[16]** Smith seeks to avoid this rule by arguing that his post-conviction counsel's failure to depose the relevant witnesses resulted in counsel abandoning Smith, which qualifies as an external objective factor that caused Smith's failure to exhaust his state remedies. *See id.* at 754. Although Smith voiced his disapproval of his post-conviction counsel's strategic decisions, he has failed to show that those decisions rose to the level of an external objective factor causing the procedural default. The alleged errors of his attorney in the first state post-conviction trial proceedings did not prevent Smith from thereafter raising his substantive post-conviction claims with the Oregon Court of Appeals and the Oregon Supreme Court. *See Custer v. Hill*, 378 F.3d 968, 974-75 (9th Cir. 2004) (holding that a federal habeas petitioner could not rely on state post-conviction attorney errors to overcome procedural default when the petitioner did not preserve the substantive claims by presenting them pro se to the Oregon Supreme Court).[14] When the state post-conviction trial court denied

---

[14]Smith's reliance on our decision in *Manning v. Foster*, 224 F.3d 1129 (9th Cir. 2000), to establish cause based on attorney errors in the post-conviction process is misplaced. In *Manning*, we held that a petitioner could excuse his procedural default when post-conviction counsel errors, "though not constitutionally defective, were not attributable to him because they were both unauthorized *and tainted by a conflict of interest*." 224 F.3d at 1135 (emphasis added). Smith has not alleged that a conflict of interest caused the ineffective assistance of his post-conviction counsel.

Smith's request for new counsel, he elected to challenge that decision alone on appeal, rather than also challenge the denial of his substantive state post-conviction claims. Smith's failure to exhaust his state court remedies was thus independent of any alleged errors committed by Smith's post-conviction trial counsel. Therefore, Smith's allegation of ineffective assistance of counsel during his first state post-conviction trial does not constitute cause sufficient to excuse his procedural default, and we need not address whether he has shown prejudice with respect to that claim.

Next, while Smith procedurally defaulted on his *Brady* claim by raising it for the first time in his federal habeas petition, he argues that there is cause and prejudice to excuse the default because the state wrongfully withheld the results of Edmonds's polygraph examination. The results of that examination, in which Edmonds stated that Smith killed Emmett Konzelman, were inconclusive. The polygraph examiner nevertheless gave his opinion that Edmonds had answered the questions truthfully and the state followed through with its plea offer to Edmonds. Smith requested a copy of the results immediately, but the state refused to divulge them. Smith claims that he assumed that Edmonds passed the polygraph because it was an express condition of the plea deal offered to Edmonds. When Edmonds's second recantation affidavit revealed that the results of the polygraph examination were inconclusive, Smith again requested the results, and the state finally gave a copy to Smith while his federal habeas petition was pending in the district court. Smith contends that the state's withholding of the polygraph results for so long constitutes cause and prejudice to excuse the procedural default of his *Brady* claim.

Even assuming that Smith could show cause for the procedural default of his *Brady* claim, he has failed to demonstrate any "prejudice as a result of the alleged violation of federal law . . . ." *Coleman*, 501 U.S. at 750. Under *Brady*, the prosecution may not withhold any evidence that is material and

favorable to the accused. *Brady*, 373 U.S. at 87-88; *United States v. Jernigan*, 492 F.3d 1050, 1053-54 (9th Cir. 2007) (en banc). " '[T]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.' " *Hovey v. Ayers*, 458 F.3d 892, 916 (9th Cir. 2006) (quoting *Banks v. Dretke,* 540 U.S. 668, 691 (2004)).

Prejudice ensues if the evidence that is withheld is considered "material." *Id.* Evidence is material under *Brady* if there is a "reasonable probability" that the outcome would have been different if the prosecution had not withheld the evidence. *Jernigan*, 492 F.3d at 1053 (citing *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)). Generally, the test of materiality is whether the evidence "undermines confidence in the outcome *of the trial.*" *United States v. Bagley*, 473 U.S. 667, 678 (1985) (emphasis added). When the accused enters a plea rather than proceeding to trial, however, materiality is determined by "whether there is a reasonable probability that but for the failure to disclose the *Brady* material, the defendant would have refused to plead and would have gone to trial." *Sanchez v. United States*, 50 F.3d 1448, 1454 (9th Cir. 1995).

[17] Under these standards, the results of Edmonds's polygraph examination were not material, and thus the state's delay in revealing them was not prejudicial to Smith. In the Oregon Circuit Court, where Smith entered his no contest plea, the results of polygraph examinations are inadmissible because they are "inherently prejudicial." *State v. Terry*, 37 P.3d 157, 165 (Or. 2001); *see also State v. Lyon*, 744 P.2d 231, 232 (Or. 1987) (holding that polygraph test results are inadmissible in Oregon courts even if the parties stipulate as to their admissibility). Because they are inadmissible in Oregon courts, the results of Edmonds's polygraph examination do not qualify as "evidence" for *Brady* purposes, let alone "material evidence." *Wood v. Bartholomew*, 516 U.S. 1, 6 (1995) (per curiam). Thus, it is not reasonably probable that

the immediate disclosure of the polygraph results would have influenced Smith's decision to plead no contest rather than proceed to trial because Smith "could have made no mention of them either during argument or while questioning witnesses" or at any other point in the trial. *Id.* Therefore, we find that, even assuming that Smith could demonstrate cause, he cannot show prejudice based on the state's delay in revealing the results of Edmonds's polygraph examination because those results are inadmissible in Oregon court. Accordingly, Smith cannot overcome the procedural default of his *Brady* claim.

## IV.   Conclusion

We hold that Smith procedurally defaulted the claims in his federal habeas petition, and we cannot excuse his default because he has failed to demonstrate actual innocence or cause and prejudice. Accordingly, we do not reach the merits of Smith's petition.

We vacate *Smith v. Baldwin*, 466 F.3d 805 (9th Cir. 2006), *reh'g en banc granted*, 482 F.3d 1156 (9th Cir. 2007), and we affirm the decision of the district court.

AFFIRMED.

FISHER, Circuit Judge, with whom SCHROEDER, W. FLETCHER, and PAEZ, Circuit Judges, join, concurring:

Although I concur in the result the majority reaches, I write separately because I do not adopt all of its reasoning. Specifically, I would affirm the district court's decision on narrower grounds, relying solely on the determination that Smith cannot overcome the high standard set by *Schlup v. Delo*, 513 U.S. 298 (1995), with respect to element (d) of Oregon's affirmative defense to felony murder. Thus, Smith cannot pass through the "gateway . . . to have his otherwise barred constitutional claim[s] considered on the merits." *Id.* at 315 (internal citations and quotation marks omitted).

I agree we should assume there was prosecutorial misconduct, generally for the reasons spelled out in Judge Reinhardt's and Judge Thomas' dissents. I am not persuaded, however, that the facts of this case warrant skipping over the *Schlup* gateway to remedy this misconduct. Smith's problem, even with Edmonds as a now-exculpatory witness, is his inability to demonstrate that, on the record as a whole, no reasonable juror would have concluded that he proved all the necessary elements of Oregon's affirmative defense to felony murder.

I focus on the fourth element, which requires the defendant to prove that he "[h]ad no reasonable ground to believe that any other participant was armed with a dangerous or deadly weapon." Or. Rev. Stat. § 163.115(3)(d). The plain language of Edmonds' affidavits, in which he recants his previous statements that Smith killed Mr. Konzelman, does not satisfy

Smith's burden with regard to this element. At most, the affidavits would establish that Smith was not the real killer, but they do not resolve the separate question of whether Smith "had a reasonable ground to believe" that Edmonds was armed before he beat Mr. Konzelman with the crowbar.

To evaluate how a jury would likely resolve that question, our *Schlup* review "must consider all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." *House v. Bell*, 126 S. Ct. 2064, 2077 (2006) (internal citations and quotation marks omitted). Although this is a closer question than the majority indicates, I ultimately join its conclusion that Smith has not met his burden of proof to warrant passing through *Schlup*'s actual innocence gateway.

To characterize Edmonds' statements as "occasionally" contradictory is an understatement. Op. 16645. As Judge Bybee described in his dissent from the three-judge panel decision in this case, "Edmonds has given many accounts of that evening, which together encompass nearly every possible way that the burglary and murder might have occurred." *Smith v. Baldwin*, 466 F.3d 805, 831 (9th Cir. 2006) (Bybee, J., dissenting), *reh'g granted*, 482 F.3d 1156 (9th Cir. 2007). For the purpose of Smith's element (d) argument, the discrepancies regarding the Smith's and Edmonds' respective comings-and-goings into the Konzelmans' house are particularly pertinent.

At different times, Edmonds has alternatively said that: (1) Smith *returned* to the garage to obtain *the rope and the crowbar after* he and Edmonds had entered the house; (2) Smith *already* had the *crowbar* in his hands when they entered the house for the first time, and Smith *returned* to the garage only to get the *rope*; or (3) Edmonds didn't "have any idea where the crowbar came in at," because the first time he saw it was in the Konzelmans' bedroom. In each re-telling of this story,

there have been periods when Edmonds was alone in either the house or the garage while Smith was in the other location, and the order of who followed whom into the house has often changed. Depending on the time-line one accepts, Edmonds could have entered the house either before or after Smith, and removed the crowbar from the garage and carried it into the house without Smith's knowledge. *See* SR Dissent at 16696 n.10. A reasonable juror *could* adopt this interpretation and conclude that Smith had no reason to know about the crowbar before Edmonds used it to beat Mr. Konzelman.

Under *Schlup*, however, Smith must prove that *it is more likely than not that no reasonable juror* would conclude that Smith had a reasonable ground to believe that Edmonds was armed. *See, e.g.*, *House*, 126 S. Ct. at 2077; *Carriger v. Stewart*, 132 F.3d 463, 478 (9th Cir. 1997). Smith cannot satisfy this high standard. Despite — or perhaps because of — the inconsistencies, a reasonable juror most likely would find that (1) there was a period when Edmonds and Smith were in the same location when Edmonds had the crowbar before he used it, and that (2) Edmonds could not conceal the three-foot weapon from Smith during this time — indeed, that he had no reason to do so. Because it is more likely than not that a reasonable juror would conclude that Smith had a reasonable ground to believe that Edmonds was armed, Smith cannot meet his burden with respect to element (d) of Oregon's affirmative defense to felony murder.

In reaching this conclusion, I do not feel it useful to speculate on the contents of Edmonds' hypothetical testimony if he were to testify at a hypothetical evidentiary hearing. I submit this is largely irrelevant to our inquiry given the nature of the cumulative record. Even if Edmonds testified that Smith did not know that he was carrying the crowbar, we must "assess how reasonable jurors would react to the *overall*, newly supplemented record." *House*, 126 S. Ct. at 2078 (emphasis added). "If new evidence so requires, this may include consideration of 'the credibility of the witnesses presented at trial.' "

*Id.* (internal citations omitted). We must evaluate how a jury would respond to *all* of Edmonds' statements, not just his hypothetical, exculpatory version. Given the numerous inconsistencies and contradictions in Edmonds' various accounts, it is unlikely that reasonable jurors would find Edmonds' new testimony sufficiently credible to rule out that Smith knew about the crowbar before Mr. Konzelman's beating. *See Schlup*, 513 U.S. at 330 (explaining that where "newly presented evidence may [ ] call into question the credibility of the witnesses presented at trial," then "the habeas court may have to make some credibility assessments"). Therefore, viewed in the totality of all the circumstances, Smith cannot show that more likely than not, no reasonable juror would conclude that he had a reasonable ground to believe that Edmonds was armed. Consequently, regardless of Edmonds' hypothetical testimony, I conclude that Smith does not meet *Schlup*'s actual-innocence gateway standard with respect to element (d) of Oregon's affirmative defense to felony murder.

---

REINHARDT, Circuit Judge, with whom THOMAS, Circuit Judge, joins, dissenting:

Reading the majority opinion, one could hardly discern that this appeal is about a case of egregious prosecutorial misconduct—threatening a witness with *execution* if he testifies favorably to the defendant. Instead, the majority engages in a remarkable and creative act of hypothetical appellate fact-finding and, on the basis of the testimony it believes might have been given, concludes that the witness's testimony and that of others, whatever that testimony might have been, would be of no consequence. Given that the threatened witness was the only person other than the petitioner who had direct knowledge of the critical aspects of the events of the evening in question and the only person other than the petitioner who was capable of testifying to them, it is not surprising that the prosecutor failed to anticipate that any court, let

alone an en banc appellate court, would determine without his testimony having been adduced that whatever he said would be of no significance, and that regardless of what his testimony might be an evidentiary hearing could not have produced any material facts. Had the prosecutor realized that our court could have reached such an unprecedented result, he most surely would not have felt compelled to engage in so extreme an act of prosecutorial misconduct. He would have let the witness testify instead of threatening to have him executed.

## I.

In this case, Smith's co-defendant, in order to avoid murder charges and obtain a light sentence, turned state's evidence and agreed to swear that Smith, an accomplice to the robbery, was the person who killed the victim. The facts, however, showed that the co-defendant, himself, was more likely the killer.[1] Nevertheless, the co-defendant's plan succeeded and he was out of prison within three years of his plea agreement, while Smith, who, according to the evidence, most likely assaulted no one, pled no contest to felony murder in order to avoid trial on a capital murder charge. Following his plea, Smith received a life sentence.

The plea arrangement in this case was not unique. The participant in criminal activity who confesses first and fingers his fellow wrongdoer frequently receives a far lighter sentence, even though he may have been the primary culprit and committed the more egregious act. As a result, his hapless associate who played a lesser role often receives the harsher punishment—sometimes even a death sentence.[2] *See, e.g.*,

---

[1] *See Smith v. Baldwin*, 466 F.3d 805, 814-17 (9th Cir. 2006), *reh'g en banc granted* 482 F.3d 1156 (9th Cir. 2007).

[2] The Supreme Court has recognized the inherent unreliability of an accusation made by a defendant against his co-defendant. As the Court explained in *Lilly v. Virginia*, 527 U.S. 116 (1999),

*Coleman v. McCormick*, 874 F.2d 1280 (9th Cir. 1989) (en banc).

What *is* unique about this case is that when Edmonds, the probable killer, attempted, seven years later, to recant and to testify that Smith was not the murderer, the state prosecutor succeeded in preventing an evidentiary hearing by threatening to seek the death penalty against Edmonds if he testified favorably to Smith. At the time of the threat, Smith had filed his federal habeas petition asserting that he had not committed a violent act against anyone and that, under Oregon law, he was actually innocent of felony murder. Accordingly, he asserted, he was entitled under *Schlup v. Delo*, 513 U.S. 298 (1995), to bypass his state procedural default and present his claim that his conviction of felony murder was obtained in violation of his constitutional rights.[3] In seeking to bypass the procedural default, Smith simply sought to have the federal court examine those constitutional claims on the merits.

Not surprisingly, in response to the state's threat to have him executed, Edmonds, the likely killer, invoked his Fifth Amendment privilege and refused to testify. As a result, the district court found that a *Schlup* evidentiary hearing would

> when one person accuses another of a crime under circumstances in which the declarant stands to gain by inculpating another, the accusation is presumptively suspect and must be subjected to the scrutiny of cross-examination. . . . 'Due to his strong motivation to implicate the defendant and to exonerate himself, a codefendant's statements about what the defendant said or did are less credible than ordinary hearsay evidence.'

*Id.* at 132 (quoting *Bruton v. United States*, 391 U.S. 123, 141 (1968) (White, J., dissenting)). Despite this admonition from our highest court, criminal convictions are still obtained on the basis of co-defendant accusations with great frequency.

[3]Smith also pled guilty to the robbery, but in his habeas petition he did not deny his guilt of that offense and did not seek to set aside that conviction or his sentence on that count.

be a "pointless exercise" and concluded that, without the admitted killer's[4] exculpatory testimony, Smith could not establish actual innocence in a manner sufficient to overcome his procedural default and to allow him to proceed on the merits of his constitutional claims.

In short, the effect of the state's prosecutorial misconduct[5] —threatening to seek the death penalty against Smith's key witness if he testified favorably to Smith—was to deny Smith the opportunity to develop the facts necessary to establish his *Schlup* claim. Because of the state's misconduct, Smith could not overcome the procedural barrier to his receiving a hearing on the merits of the alleged constitutional violations. Put differently, the state's threat to have Edmonds executed eliminated the crucial—indeed, the only—evidentiary process that would have allowed Smith to pass through the *Schlup* gateway and, as a result, present his constitutional claims in federal court.

---

[4]Although Edmonds never formally confessed to having killed Konzelman, he twice stated affirmatively, in his affidavits, that Smith was *not* the killer. Given that Smith and Edmonds were the only two intruders in the house when the attack occurred, the only reasonable inference from Edmonds's absolution of Smith is that Edmonds himself was the murderer. Indeed, as the state itself acknowledged, "Edmonds has implicitly admitted that he, rather than [Smith], was the killer, [even though] he has never directly admitted as much."

[5]There can be little doubt that the state's actions qualify as prosecutorial misconduct. As the panel opinion explained:

> Threatening a potential witness for the defense with execution constitutes prosecutorial misconduct far more coercive than that present in any reported case of which we are aware. The cases in which courts have considered the prosecution's threats to charge witnesses with perjury or other criminal offenses, have all involved the possibility of far less serious punishment. . . . Here, the prosecution's unprecedented threat to *seek the death penalty* against Edmonds if he testified that Smith was not the killer was unquestionably coercive and constituted substantial interference with Edmonds's decision whether to testify.

*Smith*, 466 F.3d at 823 (citations omitted; emphasis in original).

## II.

The primary question before us is thus simply: what does a federal court do when the state, by an act of gross prosecutorial misconduct, interferes with a habeas petitioner's ability to make a showing of his actual innocence in a manner that would allow the federal court to excuse his state procedural default? It is not a question we have faced before, nor a situation we are likely to face often. The majority seeks to avoid answering the question by asserting that even had an evidentiary hearing been held, Smith could not have proved his innocence. Aside from the fact that this is somewhat like saying, "We don't need a trial because we know that the defendant is guilty," there is a fundamental flaw in the majority's approach. My colleagues do not evaluate Smith's claim on the basis of what evidence could have been adduced at an evidentiary hearing. Instead, they base their decision on what Edmonds said years ago, shortly after the killing, when he was trying to shift the blame to Smith so that he would not be subject to a lengthy term of imprisonment himself. The majority's mode of analysis obviously ignores the basic point that Edmonds has filed affidavits retracting his earlier testimony and is now, in offering to exonerate Smith, purporting to tell the truth for the first time. Whether he did so shortly after the killing or whether his current story is true can be determined *only* when he is placed under oath and is subject to cross-examination by both sides—in short, at an evidentiary hearing.

Let me emphasize that the record is clear. As the district court found, "The Linn County prosecutor's office . . . warned Edmond's [sic] counsel that the district attorney *would seek the death penalty* if Edmonds testified . . ." (emphasis added). There can be no doubt about the prosecution's goal in making that threat. Critically, the prosecution did not threaten to seek the death penalty against Edmonds *if he turned out to be the true killer*. Rather, it threatened Edmonds with execution only *if he testified* at Smith's evidentiary hearing. That the state

dropped its threat against Edmonds as soon as he declined to testify—that it never investigated his statements or sought to determine whether his recantation might be true—makes crystal-clear the state's purpose in threatening Edmonds with the death penalty: to prevent Edmonds from testifying at Smith's hearing and exculpating Smith of felony murder.

The question we now face, as I have explained above, is how should we consider Smith's *Schlup* claim given that the state's misconduct has rendered an evidentiary hearing a "pointless exercise." The majority's solution is to imagine a hypothetical evidentiary hearing at which Edmonds would testify, having been granted use immunity by the state, "that he, rather than Smith, killed Mr. Konzelman." Maj. op. at 16660. The majority then determines that Edmonds's hypothetical testimony that Smith was not the true killer would not be credible and that, even if it were credible, it would not benefit Smith because Smith would still have to prove that he himself never held the crowbar nor had a reasonable ground to believe that Edmonds had it. Relying almost entirely on Edmonds's prior self-serving and ambiguous statements made when he was trying to shift the blame to Smith to avoid capital murder charges himself, the majority holds that Smith could not meet his burden of proving *Schlup* actual innocence because at least one reasonable juror would still find Smith guilty of felony murder.

The principal fallacy in the majority's approach is apparent on its face. It disregards the historic and constitutionally guaranteed system under which American courts determine the facts. A full and fair hearing at which Edmonds was permitted to testify is the only way that Smith could have established the factual elements required to make out his defense to felony murder, and thus his *Schlup* actual innocence claim. By conducting an evidentiary hearing we could have determined whether Edmonds's initial story or his current affidavits were true. In the absence of that hearing, it is impossible to determine what Edmonds might have said or what Smith might

have established. Had a hearing been held, Smith's lawyer, who presumably understood the elements of the affirmative defense that Smith was required to establish, could have explored those elements fully in questioning Edmonds. Smith, presumably, would have also testified at the hearing. His testimony, like Edmonds's, would likely have provided significant details regarding the events that took place in the garage, the timing of the two men's entrance into the Konzelman home, and the subsequent events inside the home, all of which could have established definitively whether Smith had held the crowbar or, if he had not, whether he had reason to believe that Edmonds was armed with it. Both men would have been subject to rigorous cross-examination. Perhaps their testimony on direct would not have held up. Perhaps it would not have been sufficient to allow Smith to meet the five-part test necessary to establish an affirmative defense to felony murder under Oregon law. At least a fair and full hearing would have been held and a judge could have ruled on the two defendants' credibility and assessed the facts. We will never know what the results of a *Schlup* hearing would have been, however, because the prosecution's blatant misconduct rendered such a hearing impossible.

The majority's unprecedented attempt to construct a hypothetical evidentiary hearing as a substitute for an actual hearing—the one the prosecution prevented from being held—fails to fill the gaping holes in the record created by the state's unconscionable interference. In the majority's mythical hearing, Edmonds states one thing only: that he, not Smith, was the actual killer. In that construct, Edmonds does not provide details about the night in question. He does not say whether Smith ever held the crowbar nor does he provide facts that might indicate whether Smith had reason to believe that Edmonds had the crowbar. In sum, the majority's construct assumes that Edmonds's affidavits—which do not address Smith's affirmative defense but state only that Smith was not the killer—comprise the full scope of what

Edmonds's testimony would have been had an evidentiary hearing taken place.

Such an assumption is entirely unreasonable. The purpose of Edmonds's affidavits was not to establish all the elements of Smith's affirmative defense. Edmonds sought only to inform the interested parties, including the state, that his statements inculpating Smith seven years earlier, made in exchange for lenient treatment, were false. The affidavits do not purport to set forth any of the factual circumstances surrounding the killing or to describe fully the events of the evening in question.[6] Accordingly, it makes little sense to assume, as the majority's construct does, that, had an evidentiary hearing been held, Edmonds would have merely repeated the statements in his affidavits, and nothing more. Rather, in the absence of specific knowledge as to what Edmonds and Smith would have said had the state's misconduct not rendered an evidentiary hearing futile, an approach far more consistent with our constitutional principles of due process is for the court to presume that the evidence precluded by the state's misconduct would have materially benefitted Smith with respect to his *Schlup* claim, and, accordingly, to allow him to present his constitutional claims on the merits.

Such a presumption is hardly unusual in civil litigation.[7] "Generally, a trier of fact may draw an adverse inference from the destruction of evidence relevant to a case." *Akiona v. United States*, 938 F.2d 158, 161 (9th Cir. 1991); *see also* 2 Kenneth S. Broun et al., *McCormick on Evidence* § 265 (6th ed. 2006). As we stated in *Akiona*,

---

[6]Indeed, the majority's criticism of those affidavits for their incompleteness, *see* maj. op. at 16671 (stating that "[n]either recantation addresses th[e] issue" whether Smith and Edmonds entered the house at the same time); *id.* at 16672 (noting that neither of Edmonds's affidavits addresses whether Smith could have seen the crowbar when he paused briefly at the bedroom door), only underscores this point.

[7]A petition for habeas corpus, of course, initiates a civil proceeding. *Mayle v. Felix*, 545 U.S. 644, 654 n.4 (2005).

The adverse inference is based on two rationales, one evidentiary and one not. The evidentiary rationale is nothing more than the common sense observation that a party who has notice that a document is relevant to litigation and who proceeds to destroy the document is more likely to have been threatened by the document than is a party in the same position who does not destroy the document. . . .

The other rationale for the inference has to do with its prophylactic and punitive effects. Allowing the trier of fact to draw the inference presumably deters parties from destroying relevant evidence before it can be introduced at trial.

*Akiona*, 938 F.2d at 161 (quoting *Nation-Wide Check Corp., Inc. v. Forest Hills Distribs., Inc.*, 692 F.2d 214, 218 (1st Cir. 1982)). Both rationales apply equally strongly to the state's willful intimidation of a critical witness with the result that he refuses to testify at a habeas petitioner's *Schlup* evidentiary hearing and thus renders the hearing, in the words of the district court, a "pointless exercise." First, the state's interference with Edmonds's willingness to testify raises the obvious inference that the state was "likely to have been threatened by," *Akiona*, 938 F.2d at 161 (quoting *Nation-Wide*, 692 F.2d at 218), Edmonds's testimony—why else would the prosecution have gone to such unconscionable lengths to prevent him from testifying? Put differently, if, as the majority suggests, Edmonds's testimony would have been of no assistance to Smith in a *Schlup* hearing because it would not establish Smith's innocence of felony murder, why was the state so desperate to prevent his testimony? Why would it have engaged in egregious prosecutorial misconduct by threatening to have Edmonds executed if he testified? Thus the inference is rational and fairly drawn. Equally important, if we presume that Edmonds's testimony would have been favorable to Smith, our action would have a most beneficial effect. It would deter the state from unlawfully interfering with the

introduction of relevant evidence in future habeas and other proceedings.

The deterrence rationale takes on added importance when considered in light of the purposes of the *Schlup* doctrine. The *Schlup* gateway is an outgrowth of the Supreme Court's recognition that "the conviction of one innocent of the crime" for which he was convicted represents a "fundamental miscarriage of justice." *McCleskey v. Zant*, 499 U.S. 467, 494 (1991); *see also Schlup*, 513 U.S. at 314-15. Meeting the *Schlup* standard does not by itself prove that such a miscarriage has taken place,[8] but doing so raises a significant possibility that the petitioner may not have been guilty of the offense for which he was convicted. This possibility warrants an exception to the procedural default rule to allow the federal court to make absolutely certain that no miscarriage of justice occurs. *See Schlup*, 513 U.S. at 316. When the state, through an act of flagrant prosecutorial misconduct, precludes the introduction of evidence that, had it been admitted, would undermine the court's confidence in the outcome of a criminal proceeding, it substantially increases the possibility that a fundamental miscarriage of justice—the conviction of an innocent individual—has occurred. Even more so if the state by that egregious misconduct precludes the holding of the evidentiary hearing itself. This is certainly behavior that federal courts, charged with upholding constitutional protections, should seek to deter. For this reason, it is especially appropriate in the context of a habeas petitioner's *Schlup* actual innocence claim to apply the standard presumption that the precluded evidence was unfavorable to the party that caused its preclusion and, here, that the precluded evidentiary hearing would have resulted in an outcome favorable to the other party.

---

[8]This is in contrast to prevailing on a freestanding actual innocence claim, which alone is grounds for granting habeas relief but imposes a much more difficult—indeed, possibly insurmountable—burden on the petitioner. *See Herrera v. Collins*, 506 U.S. 390 (1993).

### III.

I will not here engage in the extraordinary process of appellate factfinding that the majority does when it concludes that a reasonable juror would more likely than not find that Smith had failed to meet at least one element of his affirmative defense. Such factual determinations are a matter for the district court in the first instance. They are to be made after a thorough review of facts adduced at a habeas petitioner's evidentiary hearing. In this case, however, such a hearing was precluded by the state's deliberate and egregious misconduct, and the district court was unable to make any findings. As a result, the majority does so on its own, relying almost entirely on Edmonds's past statements—which are in serious doubt in light of his recantations—as well as on hypothetical testimony at a hearing that never took place. Such creative prestidigitation is no substitute for an actual evidentiary hearing. Moreover, the majority makes *credibility* findings as to Edmonds's hypothetical testimony at its hypothetical hearing. Needless to say, such credibility findings are a question for the district court and cannot be made on appellate review, especially in the absence of any testimony on which to base those findings.[9]

---

[9]The majority strangely suggests that we are "being inconsistent," maj. op. at 16668-69 n.11, in criticizing its hypothetical credibility determinations because an en banc decision that we joined, *Carriger v. Stewart*, 132 F.3d 463 (9th Cir. 1997) (en banc), concluded that a state court's credibility determination was "not fairly supported by the record as a whole" and therefore was "not entitled to a presumption of correctness," *id.* at 475-76. The majority's comparison of its own approach to that of *Carriger* is, to say the least, bizarre. In *Carriger*, the state court had found that a deceased witness's confession, which it had not itself witnessed, was not consistent with the physical evidence and therefore not credible. *Id.* at 473. The en banc court, reviewing the entire record, concluded that there was "virtually no . . . support for the state court's rejection of [the witness's] confession" and, consequently, declined to defer to the state court's credibility finding, pursuant to 28 U.S.C. § 2254(d)(8) (1994). *Id.* at 475; *see also* 28 U.S.C. § 2254(d)(8) (1994) ("[A] determination . . . of a factual issue, made by a State court of competent jurisdiction . . . , shall be presumed to be correct, unless . . . the Federal court on a consideration of . . . the record as

The majority's analyses of elements (b) and (c) of the affirmative defense—whether Smith killed Konzelman and whether he was himself armed with the crowbar—as well as its analysis of element (d)—whether Smith had reason to believe Edmonds was armed—are based almost entirely on hypothetical, non-existent evidence. Because such determinations are wholly invalid in the absence of an evidentiary hearing, I will not discuss each of them individually here.

To the extent that the majority's analysis of element (d) relies on evidence other than Edmonds's past statements,[10] such evidence is trivial and fails to prove that Smith had reason to believe that Edmonds was armed with the crowbar. First, there is Mrs. Konzelman's testimony. Contrary to the majority's assertion, there is little reason to believe on the basis of her testimony that Smith saw the crowbar on the bedroom floor when he paused briefly in the doorway. Mrs. Konzelman stated that she herself did not see the crowbar until the attacker picked it up from the ground just prior to assaulting her husband. She also stated that the second burglar's pause

a whole concludes that such factual determination is not fairly supported by the record."). The *Carriger* court's appellate review, pursuant to statute, of a credibility determination made by the state court—that the state court was *in no better position to make*—is a far cry from this majority's credibility assessment of hypothetical testimony that has never been given, let alone passed upon by a lower court.

[10]The linchpin of the majority's reasoning as to element (d) is Edmonds's prior statements indicating that he and Smith entered the Konzelmans' residence "at or around the same time." Maj. op. at 16671. Without Edmonds's statements, which were, in any event, vague and imprecise, two of the majority's primary factual bases—that the crowbar is three-feet long (and therefore difficult to conceal) and that there was sufficient light in the garage to see objects—would be wholly irrelevant. It would make little difference that the crowbar was long or that the garage was sufficiently lit if Smith and Edmonds did not enter the house together. If Edmonds entered sometime after Smith (or perhaps even vice versa) he could have easily removed the crowbar from the garage and carried it into the house without Smith's knowledge.

at the doorway was brief—just long enough for her to see his bandana—which is consistent with Edmonds's affidavit stating that Smith "never entered the Konzleman's [sic] bedroom." These facts strongly suggest that Smith did not have the occasion during his brief pause at the doorway to search the room visibly and observe the crowbar, which was on the floor and out of plain sight.

Second, three of the majority's primary pieces of evidence prove nothing more than that Smith learned at some point, either during, or more likely after, the attack, that Edmonds was armed with the crowbar.[11] It would be patently unreason-

---

[11]These pieces are: (1) the ultimate locations of the rope and crowbar, (2) Smith's guilty plea on the robbery charge, and (3) the majority's theory that Smith may have witnessed Edmonds committing the attack from another room.

First, the majority asserts that "the ultimate placement of the [rope and crowbar] permits the reasonable inference that Smith and Edmonds crossed paths while Edmonds had the crowbar and Smith the rope[ ] . . . ." Maj. op. at 16673. To the extent that the objects' placement implies that Smith and Edmonds "crossed paths," however, it does *not* imply that they did so *prior* to the beating. To the contrary, given that Smith never entered the bedroom before the beating, the only reasonable inference that can be drawn is that, if the two crossed paths at all, allowing Smith to see Edmonds holding the crowbar, it was only *after* the attack had taken place.

Second, the fact that Smith pled to the robbery charge that alleged that the defendants used a crowbar proves nothing more than that he had learned at some time that Edmonds had a crowbar. This is hardly a surprising admission, given that Smith would certainly have learned of that fact when he discovered that Konzelman had been murdered, if only from being so informed by the police.

Finally, the majority's conjecture that "it is entirely plausible that Smith returned to the bedroom doorway when he heard the beating, or that he moved to a vantage point in the hallway from which he was not visible to Mrs. Kozelman [sic] but could still see the attack," maj. op. at 16672, if it may even be believed, proves only that Smith discovered that Edmonds had the crowbar *while* the attack was taking place. It says nothing about whether Smith had reason to believe *prior* to the attack that Edmonds had picked up the crowbar—the only time frame that is relevant to element (d) of the affirmative defense.

able to find that Smith "[h]ad . . . reason to believe that [Edmonds] was armed with a dangerous or deadly weapon" for the purposes of Oregon Revised Statute § 163.115(3)(d) if he discovered that Edmonds had possession of the crowbar only *while* Edmonds was committing the attack or *after* it had taken place. The purpose of an affirmative defense statute, after all, is to ensure that only persons who were aware beforehand that a death could occur during the felony, and therefore might have acted to prevent it, may be held liable for felony murder. These points are thus wholly irrelevant to the question whether Smith had reasonable ground to believe *prior to the attack* that Edmonds was armed.

The majority's attempt to bolster its analysis through Smith's 1992 post-conviction deposition testimony is also unavailing. Although Smith "consulted with his counsel" about other defenses his trial counsel could have raised, we have no idea whether Smith's post-conviction counsel told him that not having reason to know that Edmonds had a crowbar constituted such a defense, or whether Smith understood him if he had. (We could, of course, have learned the answer to these questions had the evidentiary hearing to which Smith was entitled been held.) Thus, the fact that Smith never explicitly stated during that deposition that he was unaware Edmonds had the crowbar tells us nothing. Moreover, the majority interprets Smith's deposition statement that he "didn't know that [Edmonds] was going to [kill Konzelman]" as meaning that Smith was "unaware Edmonds had the *intent to use the crowbar.*" Maj. op. at 16675 (emphasis added). Smith's statement, however, could just as easily mean that Smith was unaware that Edmonds *had* the crowbar. Indeed, that may be the more reasonable interpretation of Smith's vague utterance—after all, Smith may have been unaware that Edmonds was going to kill Konzelman precisely *because* he never saw Edmonds holding the crowbar.

In sum, the majority's evidentiary analysis depends almost entirely on credibility determinations of Edmonds's never-

given testimony at a hearing that never occurred; the few crumbs of evidence that do not fall in that category fail to support the majority's conclusion, and, if they did, they would hardly be sufficient.[12]

---

[12]Judge Fisher's approach, while rightly rejecting the majority's reliance on Edmonds's hypothetical testimony, *see* Fisher op. at 16684, ultimately fails for the same reason the majority's does. Judge Fisher notes that Edmonds's past statements concerning "Smith's and Edmonds' respective comings-and-goings into the Konzelmans' house" were highly inconsistent, Fisher op. at 16683, and concludes on that basis that a reasonable juror would most likely find that Edmonds and Smith were together at least sometime during the evening and that Smith would have seen Edmonds carrying the crowbar at that point, Fisher op. at 16684. Like the majority, Judge Fisher believes that an evidentiary hearing would have made no difference because Smith could not have proven his actual innocence regardless of what Edmonds might have said. But the fact that Edmonds changed his story so many times when he was attempting to shift the responsibility to Smith surely cannot defeat Smith's *Schlup* claim. That a defendant trying to pin the blame on someone else was unable to keep his story straight does not provide reason to credit *one* of those stories over the others, as Judge Fisher suggests; if anything, it is reason to discount *all* of Edmonds's past stories as fabricated in an attempt to avoid culpability himself. At the very least, Edmonds's failed past inconsistent statements are not a reason to deprive Smith of an evidentiary hearing. *Because* the existing evidence in the record is so utterly unreliable, as Judge Fisher himself recognizes, we cannot assume that what Edmonds might say at an evidentiary hearing at which he finally accepts responsibility for the crime would have no bearing on whether Smith could prove his affirmative defense.

Given that Judge Fisher also appears to recognize the egregious nature of the prosecutorial misconduct, I am puzzled as to why he would simply assume that fact for the purpose of the opinion rather than stating expressly that he, like the dissenters, would hold that the prosecutor's behavior was grossly improper and unethical. Although I disagree with the majority for all the reasons expressed in this dissent, I find its failure to adopt such a holding and to condemn expressly the prosecutor's conduct particularly inexcusable. I would hope that its unwillingness to do so would not encourage other prosecutors to believe that they may engage in similar threats to seek the death penalty against witnesses who might testify to facts that are contrary to the prosecution's theory of the case.

IV.

Finally, I note briefly that, although the majority does not advocate holding a hearing, because it believes that its hypothetical construct dispenses with any need for doing so, it also appears to suggest that granting Edmonds use immunity could effectively remedy the prosecutorial misconduct. This is also erroneous. As the panel opinion explained, granting Edmonds use immunity

> would not effectively counter the threat of execution, as the state would be free to seek the death penalty even if barred from relying on Edmonds's testimony. If Edmonds did decide to testify, there would be no way to ensure that the looming prosecutorial threat of execution would not significantly influence his testimony. . . . Any testimony that contradicted his affidavits would be of doubtful reliability.

*Smith*, 466 F.3d at 826-27. Because the state's threat to have Edmonds executed would taint any testimony that Edmonds might give so long as the threat of execution loomed, we could not now send the case back for an evidentiary hearing at which Edmonds testifies under use immunity. On the other hand, granting Edmonds "transactional immunity"—or total immunity from prosecution on the subject matter of his testimony—would allow Edmonds to testify more readily but would provide too much of a reward for testimony that may be untruthful, and such immunity might encourage Edmonds to lie with impunity. Thus, allowing Smith to proceed to a hearing on the merits of his constitutional claims provides the least intrusive solution; such a remedy would effectively cure the harm wrought by the prosecution's unconstitutional threat that it would seek to have a witness executed if he testified in Smith's favor, without providing too much or too little immunity to that witness. This remedy would, of course, grant no substantive relief to Smith, who would still be required to establish on the merits his claims of constitutional violations.

In any event, the majority affirms the denial of an evidentiary hearing and does not remand for the grant of use immunity. So, its discussion of that remedy is as worthless as its construct of a non-existent hearing.

## V.

In the end, it is difficult to believe that the Court took this case en banc to decide the factual question whether the evidence does or does not support an affirmative defense to felony murder under a particular provision of Oregon law.[13] We do not go en banc to sort out questions of fact or state law, or to create mythical records for hearings that never were. *See* Fed. R. App. P. 35(a) ("An en banc . . . rehearing is not favored and ordinarily will not be ordered unless: (1) en banc consideration is necessary to secure or maintain uniformity of the court's decisions; or (2) the proceeding involves a question of exceptional importance."). It is even more unfathomable that, by its fallacious evaluation of non-existent facts, the majority reaches a result the correctness of which is impossible to evaluate, all in order to avoid considering the state's flagrant prosecutorial misconduct and the consequences that should attach to it.

I regret that this court did not hold, as it should have, that threatening a witness with execution if he testifies that a person convicted of a crime is not guilty is in direct contravention of the Due Process Clause of the Constitution. We have

---

[13]Despite the majority's insistence, this case is not about construing *Schlup*. What a habeas petitioner must prove to establish actual innocence under *Schlup* is not at issue in this case. Rather, as I explained earlier, the unique problem we face is determining what a court should do when the state, by threatening to execute a habeas petitioner's key witness if he testifies at an evidentiary hearing, makes it impossible for the petitioner to establish his *Schlup* claim. The majority evades that question, however, and instead decides this case based entirely on an unprecedented process of appellate factfinding and credibility assessing of hypothetical testimony at a hearing-that-never-was.

an obligation to label such egregious prosecutorial misconduct for what it is—a gross deprivation of the petitioner's rights and a reprehensible abuse of the prosecutor's authority. Here, it is evident from the district court's finding that the effect of the state's misconduct was to deny a habeas petitioner the very evidentiary hearing necessary to establish his affirmative defense. Yet, the majority decides against Smith's *Schlup* claim almost entirely on the basis of the earlier ambiguous testimony of the probable killer who at the time was attempting to pin the murder on his partner in the robbery in order to obtain a lighter sentence for himself, and who has since recanted his story. Because, unlike the majority, I believe we cannot countenance the state's blatant violation of constitutional processes, and because, in the absence of an evidentiary hearing, I cannot deem the violation harmless on the basis of a story the threatened witness has disavowed, I respectfully dissent.

---

THOMAS, Circuit Judge, dissenting:

I concur in Judge Reinhardt's dissent, but write separately in order to amplify my views.

"It is well established that 'substantial governmental interference with a defense witness's free and unhampered choice to testify amounts to a violation of due process." *United States v. Vavages*, 151 F.3d 1185, 1188 (9th Cir. 1998) (quoting *United States v. Little*, 753 F.2d 1420, 1438 (9th Cir. 1984)); *see also Webb v. Texas*, 409 U.S. 95, 97-98 (1972) (warning witness of likely perjury prosecution constituted violation of due process).

I can conceive of no stronger governmental interference with a witness's free choice to testify than to threaten the witness with death at the hands of the state if the witness testifies consistent with his sworn affidavit. One can only describe the

government's apparent reasoning as chilling. Either the government did not believe the witness's affidavit—in which case it was prepared to seek capital punishment despite its belief that the man did not commit the murder—or the government wanted to suppress truthful statements that might cause a man who did not commit the murder to be freed or his sentence reduced. If this type of threat had been made by the defense, there is little doubt we would call it witness tampering, sanctionable by an obstruction of justice charge.

I can understand the temptation to leap to the ultimate conclusion as to potential culpability for a crime. However, drawing analytical constructs as to theoretical liability from a spare appellate record is quite different from the truth that emerges from the crucible of a courtroom hearing.

I would not brush aside the government's prosecutorial misconduct. Rather, I would hold that the petitioner's due process rights were violated by the threat made against the witness and remand for a full *Schlup* evidentiary hearing. Then, and only then, could we rest assured that there had been a meaningful search for the truth of what happened that tragic evening, and that the person most culpable in those events was receiving the punishment warranted for the senseless death of a helpless elderly man.